**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NATIONAL SECURITY ARCHIVE
2130 H Street, N.W., Suite 701
The Gelman Library
Washington, DC 20037,

                     **Plaintiff,**

v.                                    C.A. No. 1:19-cv-529

DEFENSE INTELLIGENCE AGENCY
7400 Pentagon
Washington, DC 20301,

                     **Defendant.**

**COMPLAINT**

1.      This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. Plaintiff the National Security Archive ("Plaintiff" or the "Archive") seeks injunctive and other appropriate relief for the processing and release of agency records requested by Plaintiff from Defendant Defense Intelligence Agency ("DIA" or "Defendant") on August 15, 2018. Specifically, the Archive seeks disclosure of a limited number of Lieutenant General Leonard Perroots' 1989 records related to the "1983 Soviet 'War Scare'." More than five months after submitting its FOIA request, the Archive has yet to receive a single responsive document from DIA.

**JURISDICTION AND VENUE**

2.      This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C. §§ 552(a)(4)(B), (a)(6)(E)(iii) and 28 U.S.C. § 1331.

3.      Venue lies in this district under 5 U.S.C. § 552(a)(4)(B).

**THE PARTIES**

4. Plaintiff the National Security Archive is an independent non-governmental research institute and library. The Archive was established in 1985 to promote research and public education about the U.S. governmental and national security decision-making process. It collects, analyzes, and publishes documents acquired through FOIA in order to promote and encourage openness and government accountability. The Archive serves as a repository of government records on a wide range of topics pertaining to the national security, foreign, intelligence, and economic policies of the United States. The Archive is a representative of the news media within the meaning of 5 U.S.C. § 552(a)(4)(A)(ii). *See Nat'l Sec. Archive v. U.S. Dep't of Defense*, 880 F.2d 1381 (D.C. Cir. 1989), *cert denied*, 110 S. Ct. 1478 (1990).

5. Defendant Defense Intelligence Agency is a component of the Department of Defense, a department of the Executive Branch of the United States Government. The DIA is an "agency" within the meaning of 5 U.S.C. § 552(f)(1). DIA is headquartered in the District of Columbia.

**BACKGROUND**

*The 1983 Soviet "War Scare"*

6. During the tense years of the Cold War, the American public lived in near constant fear of nuclear threats posed by the Union of Socialist Soviet Republics ("Soviet" or "Soviet Union"). What many do not know, however, is that in 1983 the world narrowly averted a nuclear crisis, thanks in part to one U.S. general acting "correctly out of instinct, not informed guidance."[1]

---

[1] The Soviet "War Scare," President's Foreign Intelligence Advisory Board (Feb. 15, 1990) at x, *available at* https://nsarchive2.gwu.edu/nukevault/ebb533-The-Able-Archer-War-Scare-Declassified-PFIAB-Report-Released/2012-0238-MR.pdf ("1990 Presidential Report").

7. During November 1983, North Atlantic Treaty Organization ("NATO") forces conducted their annual command post exercise to practice nuclear release procedures named as "Able Archer 83." 1990 Presidential Report at 69-70. While these exercises were routinely monitored by Soviet intelligence, certain hallmarks of the 1983 exercise provoked a heightened alert. *Id.* at 70.

8. Specifically, the 1983 Able Archer exercise ("Able Archer 1983") tested new procedures for releasing nuclear weaponry that "emphasized command communications from headquarters to subordinate units," and featured "pre-exercise communications that notionally moved forces from normal readiness . . . to a General Alert." *Id.*

9. In response to their detection of Able Archer 1983, Soviet intelligence initiated a "major mobilization" of their intelligence and military forces. *Id.* This included placing Soviet air forces in Germany and Poland on heightened alert, conducting over 36 intelligence flights, and transporting nuclear weapons from storage sites to launch pads by helicopter. *Id.* at vi, 71-72.

10. The scale of the Soviet response was "unparalleled" and had only been previously observed "during actual crises." *Id.* at vi, 71.

*Lieutenant General Leonard Perroots' De-escalation of the 1983 Soviet "War Scare"*

11. In 1983, Lieutenant General Leonard Perroots served as the Assistant Chief of Staff for Intelligence at Ramstein Air Base in West Germany, the U.S. Air Force's European headquarters. 1990 Presidential Report at 27-28.

12. Observing the signs of the elevated Soviet military alert, he chose not to respond, thus averting further escalation of the 1983 Soviet "War Scare": "[T]he military officers in charge of the Able Archer exercise minimized" risks to the United States "by doing nothing in the face of evidence that parts of the Soviet armed forces were moving to an unusual level of alert." *Id.* at x.

*See also, id.* at 28 (it was Perroots' decision "not to raise US [sic] readiness in response" to "detection of the Soviet Air Forces' increased alert status").

13. Lieutenant General Perroots subsequently served as the Director of the Defense Intelligence Agency from 1985 to 1988. In 1989, he wrote a letter to the President's Foreign Intelligence Advisory Board ("PFIAB") requesting an investigation into Able Archer 1983 and his concerns with the intelligence community's inadequate treatment of the Soviet Union's response. *Id.* at 27.

14. PFIAB conducted an investigation which resulted in a 1990 report confirming the Soviet Union's fears that the U.S. would launch a nuclear strike (i.e., the "1990 Presidential Report"). *Id.* at vii. The Board's report concluded: "In 1983 we may have inadvertently placed our relations with the Soviet Union on a hair trigger," and that "Soviet military leaders may have been seriously concerned that the US would use Able Archer 83 as a cover of launching a real attack." *Id.* at xii, 71.

15. Although the 1990 Presidential Report was declassified in 2015 after 12 years of FOIA requests, declassification review efforts, and advocacy by the Archive,[2] many of Lieutenant General Perroots' historically valuable files remain classified. This includes the letter in which he documented his concerns surrounding the 1983 Soviet "War Scare". These files likely tell the cautionary and relevant tale of the dangers of nuclear war by miscalculation and miscommunication.

---

[2] *1983 War Scare Declassified and For Real*, the Archive (Oct. 24, 2015), available at https://nsarchive2.gwu.edu/nukevault/ebb533-The-Able-Archer-War-Scare-Declassified-PFIAB-Report-Released/.

## PLAINTIFF'S 2018 FOIA REQUEST

16. On August 15, 2018, the Archive submitted to DIA the FOIA request at issue in this case ("the Request").[3] The Archive requested files that likely include a copy of Lieutenant General Perroots's 1989 letter seeking a PFIAB investigation into the 1983 Soviet "War Scare."

17. Specifically, Archive requested the following files from 1989 from three boxes located in the Washington Records Center in Suitland, Maryland:

"DR's Official Correspondence File" (Jan-Dec 89), "DR's Message File" (Jan- Dec 89), and "DR's Chron Files of Correspondence" (1 Jan-15 May 89) in DIA Box Numbers 1/3, "DR's Chron Files of Correspondence" (16 May-15 Nov 89) in DIA Box Numbers 2/3, and "DR's Chron Files of Correspondence (16 Nov-31 Dec 89) in DIA Box Numbers 3/3. Ex. A at 2.

18. The Request identified the records by accession number and volume, and included a copy of Standard Form 135, the form prescribed by the National Archives and Records Administration for the request of records, which identifies the specific location of the files in the Suitland, Maryland federal records facility. *Id*. at 2, 4.

19. In an August 21, 2018 letter, DIA acknowledged receipt of the Request.[4] DIA's letter stated that they would be "unable to respond" to Plaintiff's request within 20 days due to "unusual circumstances," listing the potential unusual circumstances as "the need to search for and collect records from a facility geographically separated from this office," "the potential volume of records responsive to [Plaintiff's] request," and "the need for consultation with one or

---

[3] *See* Exhibit A, Letter from Nate Jones, Dir. of the FOIA Project, the Archive, to Charles Marineau, Chief of the Office of Records Management and Info. Servs., DIA (Aug. 15, 2018).
[4] *See* Exhibit B, Letter from Charles Martineau, DIA, Records Mgmt. and Info. Servs., to Nate Jones, Dir. of the FOIA Project, the Archive (Aug. 21, 2018).

more other agencies which have substantial interest in either the determination or the subject matter of the records." Ex. B at 1.

20. DIA's letter indicated that the Request has been placed in the agency's "queue" and "will be worked in the order the request was received," noting that the workload is in excess of 1,139 requests and that the delay is "substantial." *Id.*

21. In certain "unusual circumstances," agencies may notify the requestor by written notice that it is extending the time limit for its response by no more than ten working days. 5 U.S.C. § 522(a)(6)(B)(i). The written notice must identify the expected date of determination. *Id.*

22. Unusual circumstances include the need to search for and collect records from facilities separate from the office processing the request, the need to examine a "voluminous amount of separate and distinct records" demanded in a single request, or the need for consultation with other interested agencies. *Id.* at § 522(a)(6)(B)(iii).

23. In this particular instance, there was very little "unusual" about Plaintiff's request: Plaintiff has requested three discrete boxes – hardly a "voluminous" amount of records." Ex. A at 2. Further, Plaintiff's request specifically identified the location of the three boxes within the Washington Records Center. *Id.* at 2, 4. If Plaintiff's request can be described as "unusual" in any way, it is only "unusual" in how easy it makes it for DIA to efficiently respond to its request by seeking only three pre-located boxes.

24. However, on November 26, 2018, DIA sent the Archive a status update, informing Plaintiff that its request would be placed on its "Complex Track" for FOIA processing,

meaning that Plaintiff's request "involve[s] a large number of records, or that the records requested require significant review within this agency or consultations with other agencies."[5]

25. DIA further informed Plaintiff that they currently have 1,167 open FOIA requests. Ex. C at 1. Plaintiff's request is number 1,133 within the queue. Ex. C at 1.

26. DIA's initial FOIA response listed their total number of outstanding FOIA requests as 1,139. Ex. B at 1. During the three-month period between the Defendant's initial response (August 21, 2018) and their status update to Plaintiff (November 26, 2018), Defendant's total backlog actually grew by 28 requests.

27. DIA's 2017 Annual Report indicates that their oldest outstanding request dates back to 2004.[6] The Annual Report also indicates that it can take DIA over ten years to respond to requests they determine to be "Complex." Ex. D at 5.

28. Neither of DIA's responses identified an expected time frame for its ultimate response to Plaintiff's Request.

29. To this day, DIA has failed to produce a single record in response to Plaintiff's Request.

## CAUSE OF ACTION

*Violation of the Freedom of Information Act for*
*Wrongful Withholding of Agency Records*

30. Plaintiff repeats and realleges Paragraphs 1• 29.

31. Defendant has wrongfully withheld agency records requested by Plaintiff.

32. Plaintiff has exhausted the applicable administrative remedies with respect to Defendant's wrongful withholding of the requested records.

---

[5] *See* Exhibit C, Letter from Brian Jenkins, DIA, Records Mgmt. and Info. Servs., to Nate Jones, Dir. Of the FOIA Project, the Archive (Nov. 26, 2018).
[6] *See* Exhibit D, DIA, Annual Freedom of Information Act Report (2017), at 6.

33.     Plaintiff is entitled to injunctive relief with respect to the release and disclosure of the requested records.

## **REQUESTED RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

(1)     order Defendant to promptly disclose the requested records in their entirety and make copies available to Plaintiff;

(2)     provide for expeditious proceedings in this action;

(3)     award Plaintiff costs and reasonable fees incurred in this action; and

(4)     grant such other relief as the Court may deem just and proper.

Date: February 28, 2019                                      Respectfully submitted,

*/s/ John S. Guttmann*
_____
John S. Guttmann (D.C. Bar No.: 251934)
Hilary T. Jacobs (D.C. Bar No. 1021353; pending bar admission with the U.S. District Court for the District of Columbia)
Beveridge & Diamond, P.C.
1350 I Street, N.W., Suite 700
Washington, D.C. 20005-3311
Telephone: (202) 789-6020
Facsimile: (202) 789-6190
Email: jguttmann@bdlaw.com

*Counsel for Plaintiff*