The George Washington University
Gelman Library, Suite 701
2130 H St. NW
Washington, DC 20037
Phone/Fax: (202) 994-7000/7005
Email: nsarchiv@gwu.edu
Website: www.nsarchive.org

July 2, 2021

Defense Intelligence Agency

VIA EMAIL AND POST
foia1@dodiis.mil

Defense Intelligence Agency
ATTN: FAC2C (FOIA)
7400 Pentagon
Washington, DC 20301-7400

Re: Request under the FOIA, in reply refer to: 1:19-cv-00529-CJN

Dear Information Officer:

Pursuant to the Freedom of Information Act (FOIA), I hereby request disclosure of the following:

*Two records identified by the Defense Intelligence Agency as:*

*-January 9, 1989 "End of Tour Report (Addendum) General Perroots") and*

*-March 17, 1989 "End of Tour Report (LtGen Perroots)"*

*The documents requested include an after-action letter that Lieutenant General Leonard Perroots wrote in January 1989 describing a narrowly averted nuclear crisis that occurred in Europe in 1983, when North Atlantic Treaty Organization forces' annual exercise practicing nuclear release procedures put Soviet forces on high alert.  Lack of further escalation of the 1983 Soviet "War Scare" was largely due to Lieutenant General Perroots' decision not to raise U.S. readiness in response to Soviet forces' increased alert status.*

*On February 16, 2021, the Department of State ("DOS") Office of the Historian published a transcribed version of this letter in a new volume of its Foreign Relations of the United States series, with limited redactions.  The Transcription is available to the public at the following DOS link: https://static.history.state.gov/frus/frus1981-88v04/pdf/frus1981-88v04.pdf (numbered paragraphs 1–10 on pages 1426–1429; relevant portions attached for reference).  In this publication, DOS provides the following citation to the document, from the CIA: (Central Intelligence Agency, National Intelligence Council, Job 90T00435R: Chronological Files (1988), Box 1, Folder 12: C/NIC Chrono for December 1988).*

*The National Security Archive previously received a copy of the attached Standard Form 135 the Washington D.C. Federal Records Center, which suggested that the documents were located in one of three boxes housed in the Washington Records Center.  A search conducted pursuant to a separate (but related) FOIA request that is now the subject of ongoing litigation, National Security Archive v. Defense Intelligence Agency, No. 1:19-cv-529 (D.D.C.), revealed that the letter was not in those boxes.*

An independent non-governmental research institute and library located at the George Washington University, the Archive collects and publishes declassified documents obtained through the Freedom of Information Act.  Publication royalties and tax-deductible contributions through The National Security Archive Fund, Inc. underwrite the Archive's budget.



The George Washington University
Gelman Library, Suite 701
2130 H St. NW
Washington, DC 20037
Phone/Fax: (202) 994-7000/7005
Email: nsarchiv@gwu.edu
Website: www.nsarchive.org

*This request seeks the two documents described above, whether they are housed in DIA's files stored at the Washington Records Center or elsewhere.*

If you regard any of these documents as potentially exempt from the FOIA's disclosure requirements, I request that you nonetheless exercise your discretion to disclose them. As the FOIA requires, please release all reasonably segregable nonexempt portions of documents. To permit me to reach an informed decision whether or not to file an administrative appeal of any denied material, please describe any withheld records (or portions thereof) and explain the basis for your exemption claims.

The National Security Archive qualifies for "representative of the news media" status under 5 U.S.C. Sec. 552(a)(4)(A)(ii)(II) and, therefore, may not be charged search and review fees. (See *National Security Archive v. U.S. Department of Defense,* 880 F.2d 1381 (D.C. Cir. 1989), *cert denied,* 110 S Ct. 1478 (1990)).  This request is made as part of a scholarly and news research project that is not for commercial use.  For details on the Archive's research and publication activities, visit our website at www.nsarchive.org.

To expedite the release of the requested documents, please disclose them on an interim basis as they become available to you, without waiting until all the documents have been processed. Please notify me before incurring any photocopying costs over $100.

Per the June 30, 2021, agreement (attached) reached between the National Security Archive and the Defense Intelligence Agency in the pending case *National Security Archive v. Defense Intelligence Agency*, No. 1:19-cv-529 (D.D.C.), the National Security Archive understands that the Agency will immediately start processing this request upon receipt, and will provide the National Security Archive and its counsel (John Guttmann and Hilary Jacobs of Beveridge & Diamond, P.C.) with an update on the status of this request three weeks from the date of receiving this FOIA request. Counsel can be reached at jguttmann@bdlaw.com and hjacobs@bdlaw.com.

If you have any questions regarding the identity of these records, their location, the scope of the request or any other matters, call (202) 994-7000 or send an email to foiamail@gwu.edu. I look forward to receiving your response within the twenty-day statutory period.

Sincerely,

Nate Jones

Enclosures

cc:    April Seabrook, Assistant United States Attorney

# SF-135
# Provided by the Washington Records Center

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 → 93-0058

# RECORDS TRANSMITTAL AND RECEIPT

Complete and send original and two copies of this form to the appropriate Federal Records Center for approval prior to shipment of records. See specific instructions on reverse.

| PAGE | OF |
|---|---|
| 1 | 1 PAGES |

**1. TO**
(Complete the address for the records center serving your area as shown in 36 CFR 1228.150.)

**Federal Records Center**

**6. FROM** (Enter the name and complete mailing address of the office retiring the records. The signed receipt of this form will be sent to this address)

Director
Defense Intelligence Agency
ATTN: ESO
Washington, DC  20340-1038

**2. TRANSFERRING AGENCY OFFICIAL (Signature and title)**
Ms. Melissa Foti, Records Manager
DATE: 2/9/93

**TRANSFERRING AGENCY LIAISON OFFICIAL** (Name, office and telephone No.)
M.E. Pauly, ESO, (703) 697-8130

**RECORDS RECEIVED BY (Signature and title)**
Chief Accession & Disposal Branch
DATE: 4/9/93

Fold Line

## RECORDS DATA

| ACCESSION NUMBER | | | VOLUME | AGENCY BOX NUMBERS | SERIES DESCRIPTION | RESTRICTION | DISPOSAL AUTHORITY | COMPLETED BY RECORDS CENTER | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RG | FY | NUMBER | (cu. ft.) | | (With inclusive dates of records) | | (Schedule and Item number) | DISPOSAL DATE | LOCATION | SHELF PLAN | CONT. TYPE | AUTO. DISP. |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) | (k) | (l) | (m) |
| 373 | 93 | 0040 | 3 | 1/3 | DR's Official Correspondence File (Jan-Dec 89) | S | DIAM 13-1 Item 200a | Perm 2010 | 1-59-11-62 | | | |
| | | | | | DR's Message File (Jan-Dec 89) | S | | | 11-6-5 | | | |
| | | | | | DR's Chron Files of Correspondence (1 Jan - 15 May 89) | S | | | | | | |
| | | | | 2/3 | DR's Chron Files of Correspondence (16 May - 15 Nov 89) | S | | | | | | |
| | | | | 3/3 | DR's Chron Files of Correspondence (16 Nov - 31 Dec 89) | S | | | | | | |

35-107

Standard Form 135 (Rev. 7-85)
Prescribed by NARA
36 CFR 1228.1

# Excerpt from Foreign Relations of the United States, 1981-1988 Volume IV (2021)

# FOREIGN
# RELATIONS
## OF THE
# UNITED
# STATES

## 1981–1988

## VOLUME IV

## SOVIET UNION,
## JANUARY 1983–
## MARCH 1985



## DEPARTMENT
## OF
## STATE

### Washington



**Foreign Relations of the United States, 1981–1988**

**Volume IV**

# Soviet Union, January 1983– March 1985

*Editor*            Elizabeth C. Charles

*General Editor*    Kathleen B. Rasmussen

United States Government Publishing Office
Washington
2021

DEPARTMENT OF STATE

Office of the Historian

Foreign Service Institute

For sale by the Superintendent of Documents, U.S. Government Publishing Office
Internet: bookstore.gpo.gov    Phone: toll free (866) 512-1800;   DC area (202) 512-1800
Fax: (202) 512-2250 Mail: Stop IDCC, Washington, DC 20402-0001

# About the Series

The *Foreign Relations of the United States* series presents the official documentary historical record of major foreign policy decisions and significant diplomatic activity of the U.S. Government. The Historian of the Department of State is charged with the responsibility for the preparation of the *Foreign Relations* series. The staff of the Office of the Historian, Foreign Service Institute, under the direction of the General Editor of the *Foreign Relations* series, plans, researches, compiles, and edits the volumes in the series. Secretary of State Frank B. Kellogg first promulgated official regulations codifying specific standards for the selection and editing of documents for the series on March 26, 1925. These regulations, with minor modifications, guided the series through 1991.

Public Law 102–138, the Foreign Relations Authorization Act, established a new statutory charter for the preparation of the series which was signed by President George H.W. Bush on October 28, 1991. Section 198 of P.L. 102–138 added a new Title IV to the Department of State's Basic Authorities Act of 1956 (22 U.S.C. 4351, et seq.).

The statute requires that the *Foreign Relations* series be a thorough, accurate, and reliable record of major U.S. foreign policy decisions and significant U.S. diplomatic activity. The volumes of the series should include all records needed to provide comprehensive documentation of major foreign policy decisions and actions of the U.S. Government. The statute also confirms the editing principles established by Secretary Kellogg: the *Foreign Relations* series is guided by the principles of historical objectivity and accuracy; records should not be altered or deletions made without indicating in the published text that a deletion has been made; the published record should omit no facts that were of major importance in reaching a decision; and nothing should be omitted for the purposes of concealing a defect in policy. The statute also requires that the *Foreign Relations* series be published not more than 30 years after the events recorded. The editors are convinced that this volume meets all regulatory, statutory, and scholarly standards of selection and editing.

*Sources for the* Foreign Relations *Series*

The *Foreign Relations* statute requires that the published record in the *Foreign Relations* series include all records needed to provide comprehensive documentation of major U.S. foreign policy decisions and significant U.S. diplomatic activity. It further requires that government agencies, departments, and other entities of the U.S. Government en-

gaged in foreign policy formulation, execution, or support cooperate with the Department of State historians by providing full and complete access to records pertinent to foreign policy decisions and actions and by providing copies of selected records. Most of the sources consulted in the preparation of this volume were located at the Department of State in Washington and the National Archives and Records Administration.

The editors of the *Foreign Relations* series have complete access to all the retired records and papers of the Department of State: the central files of the Department; the special decentralized files ("lot files") of the Department at the bureau, office, and division levels; the files of the Department's Executive Secretariat, which contain the records of international conferences and high-level official visits, correspondence with foreign leaders by the President and Secretary of State, and the memoranda of conversations between the President and the Secretary of State and foreign officials; and the files of overseas diplomatic posts. All of the Department's central files for 1981–1989, which were stored in electronic and microfilm formats, will eventually be transferred to the National Archives. Once these files are declassified and processed, they will be accessible. All of the Department's decentralized office files from this period that the National Archives deems worthy of permanent preservation will also eventually be transferred to the National Archives where they will be available for use after declassification and processing.

Research for *Foreign Relations* volumes in this subseries is undertaken through special access to restricted documents at the Ronald Reagan Presidential Library and other agencies. While all the material printed in this volume has been declassified, some of it is extracted from still-classified documents. The staff of the Reagan Library is processing and declassifying many of the documents used in this volume, but they may not be available in their entirety at the time of publication. Presidential papers maintained and preserved at the Reagan Library include some of the most significant foreign affairs related documentation from White House offices, the Department of State, and other Federal agencies including the National Security Council, the Central Intelligence Agency, the Department of Defense, and the Joint Chiefs of Staff.

Some of the research for volumes in this subseries was done in Reagan Library record collections scanned for the Remote Archive Capture (RAC) project. This project, which is administered by the National Archives and Records Administration's Office of Presidential Libraries, was designed to coordinate the declassification of still-classified records held in various Presidential libraries. As a result of the way in which records were scanned for the RAC, the editors of the

*Foreign Relations* series were not always able to determine whether attachments to a given document were in fact attached to the paper copy of the document in the Reagan Library file. In such cases, some editors of the *Foreign Relations* volumes have indicated this ambiguity by stating that the attachments were "Not found attached."

*Editorial Methodology*

The documents are presented chronologically according to time in Washington, DC. Memoranda of conversation are placed according to the time and date of the conversation, rather than the date the memorandum was drafted.

Editorial treatment of the documents published in the *Foreign Relations* series follows Office style guidelines, supplemented by guidance from the General Editor and the Chiefs of the Declassification and Publishing Divisions. The original document is reproduced as exactly as possible, including marginalia or other notations, which are described in the footnotes. Texts are transcribed and printed according to accepted conventions for the publication of historical documents within the limitations of modern typography. A heading has been supplied by the editors for each document included in the volume. Spelling, capitalization, and punctuation are retained as found in the original text, except that obvious typographical errors are silently corrected. Other mistakes and omissions in the documents are corrected by bracketed insertions: a correction is set in italic type; an addition in roman type. Words or phrases underlined in the original document are printed in italics. Abbreviations and contractions are preserved as found in the original text, and a list of abbreviations and terms is included in the front matter of each volume. In telegrams, the telegram number (including special designators such as Secto) is printed at the start of the text of the telegram.

Bracketed insertions are also used to indicate omitted text that deals with an unrelated subject (in roman type) or that remains classified after declassification review (in italic type). The amount and, where possible, the nature of the material not declassified has been noted by indicating the number of lines or pages of text that were omitted. Entire documents withheld after declassification review have been accounted for and are listed in their chronological place with headings, source notes, and the number of pages not declassified.

All brackets that appear in the original document are so identified in the footnotes. All ellipses are in the original documents.

The first footnote to each document indicates the source of the document and its original classification, distribution, and drafting information. This note also provides the background of important docu-

ments and policies and indicates whether the President or his major policy advisers read the document.

Editorial notes and additional annotation summarize pertinent material not printed in the volume, indicate the location of additional documentary sources, provide references to important related documents printed in other volumes, describe key events, and provide summaries of and citations to public statements that supplement and elucidate the printed documents. Information derived from memoirs and other first-hand accounts has been used when appropriate to supplement or explicate the official record.

The numbers in the index refer to document numbers rather than to page numbers.

*Advisory Committee on Historical Diplomatic Documentation*

The Advisory Committee on Historical Diplomatic Documentation, established under the *Foreign Relations* statute, monitors the overall compilation and editorial process of the series and advises on all aspects of the preparation of the series and declassification of records. The Advisory Committee does not necessarily review the contents of individual volumes in the series, but it makes recommendations on issues that come to its attention and reviews volumes as it deems necessary to fulfill its advisory and statutory obligations.

*Declassification Review*

The Office of Information Programs and Services, Bureau of Administration, conducted the declassification review for the Department of State of the documents published in this volume. The review was conducted in accordance with the standards set forth in Executive Order 13526 on Classified National Security Information and applicable laws.

The principle guiding declassification review is to release all information, subject only to the current requirements of national security as embodied in law and regulation. Declassification decisions entailed concurrence of the appropriate geographic and functional bureaus in the Department of State, other concerned agencies of the U.S. Government, and the appropriate foreign governments regarding specific documents of those governments. The declassification review of this volume, which began in 2015 and was completed in 2019, resulted in the decision to withhold 1 document in full, excise a paragraph or more in 13 documents, and make minor excisions of less than a paragraph in 20 documents.

The Office of the Historian is confident, on the basis of the research conducted in preparing this volume and as a result of the declassification review process described above, that the documentation and edito-

rial notes presented here provide a thorough, accurate, and reliable record of the Reagan administration's policy toward the Soviet Union, January 1983–March 1985.

**Adam M. Howard, Ph.D.**          **Kathleen B. Rasmussen, Ph.D.**
*The Historian*                                      *General Editor*

Foreign Service Institute
February 2021

# Preface

*Structure and Scope of the* Foreign Relations *Series*

This volume is part of a subseries of volumes of the *Foreign Relations* series that documents the most important issues in the foreign policy of the administration of Ronald Reagan. This volume documents U.S. bilateral relations with the Soviet Union from January 1983 to March 1985. Due to the importance of U.S.-Soviet relations during the Reagan administration, the Reagan subseries includes an extensive examination of U.S. bilateral relations with the Soviet Union in four volumes: *Foreign Relations*, 1981–1988, Volume III, Soviet Union, January 1981–January 1983; Volume IV, Soviet Union, January 1983–March 1985; Volume V, Soviet Union, March 1985–October 1986; and Volume VI, Soviet Union, October 1986–January 1989. In conjunction with these volumes, several other volumes in the subseries will provide the reader with a fuller understanding of how U.S.-Soviet relations impacted the global character of the Cold War and U.S. strategy during the Reagan era. For documentation on U.S.-Soviet nuclear arms control negotiations, see *Foreign Relations*, 1981–1988, Volume XI, START I, and Volume XII, INF, 1984–1988. *Foreign Relations*, 1977–1980, Volume V, European Security, 1977–1983, documents the NATO dual-track decision and TNF/INF negotiations through 1983. Documentation dealing with nuclear non-proliferation, nuclear testing, chemical and biological weapons, and space arms control, including anti-satellite systems, will be published in *Foreign Relations*, 1981–1988, Volume XL, Global Issues I. The development of the Strategic Defense Initiative and ABM-related issues and other strategic considerations are addressed in *Foreign Relations*, 1981–1988, Volume XLIII, National Security Policy, 1981–1984, and Volume XLIV, Parts 1 and 2, National Security Policy, 1985–1988. For selected documentation on the human rights situation in the Soviet Union, see *Foreign Relations*, 1981–1988, Volume XLI, Global Issues II.

*Focus of Research and Principles of Selection for* Foreign Relations, *1981–1988, Volume IV*

This volume documents the development of the Reagan administration's policies toward the Soviet Union from January 1983 to March 1985. With Reagan's signature of National Security Decision Directive (NSDD) 75 on January 17, 1983, the administration's approaches and policies toward the Soviet Union were codified in a specific four-part agenda: arms control, human rights, regional issues, and bilateral relations. This volume examines the efforts of administration officials,

namely Secretary of State George Shultz, President's Assistants for National Security Affairs William Clark and later Robert McFarlane, and NSC Staff member Jack Matlock, to implement the four-part agenda in dealing with the Soviet Union. The documentation demonstrates how administration officials developed policies related to the four-part agenda, mainly in the National Security Council (NSC) and Department of State, and then promoted these various tracks during meetings between Shultz, and on occasion Reagan, and Soviet Ambassador Anatoly Dobrynin and Soviet Foreign Minister Andrei Gromyko in various fora. Although no high-level meeting took place between Reagan and either Soviet General Secretaries Yuri Andropov or Konstantin Chernenko during their short tenures, the documents provide a window into how the Reagan administration viewed the Soviet leadership and formulated policies to deal with whomever was in charge.

The volume also documents the bureaucratic struggle Shultz faced against the NSC in implementing the four-part agenda laid out by NSDD 75 and in gaining access to President Reagan. After some wrangling, by June 1983 an understanding emerged between Shultz and Clark, which allowed Shultz regular weekly meetings with Reagan. When Jack Matlock joined the NSC Staff as primary adviser on the Soviet Union, Shultz gained a like-minded ally in approaches to dealing with the USSR. While some administration officials, such as Secretary of Defense Caspar Weinberger, consistently argued that negotiating with the Soviet Union seemed futile, Shultz, Matlock, and others pushed President Reagan to see the value in keeping lines of communication open with the Soviets. Even during tragic events, such as the Soviet downing of the KAL 007 airliner in September 1983, Shultz kept his meeting with Gromyko a few days later in Madrid and used this as an opportunity to admonish the Foreign Minister for this inexplicable act and the inability of the Soviet Union to admit fault on the international stage.

The volume documents several Cold War flashpoints during the contentious months of 1983. The announcement in March 1983 of Reagan's Strategic Defense Initiative (SDI) caused concern for the Soviet Union because it shifted the strategic balance from the theory of mutually assured destruction toward a defensive nuclear posture. Aside from the downing of the KAL airliner, the Euromissiles crisis came to a head with U.S. deployments of INF missiles to several NATO allies in late November 1983. While the bulk of the documentation dealing with these negotiations is covered in two other volumes, the scheduled deployments permeated all other aspects of U.S.-Soviet relations in 1983. The volume also presents selective documentation related to the 1983 Soviet "War Scare" and the November 1983 NATO nuclear exercise, Able Archer (see Appendix A). The volume attempts to dem

onstrate that even with these challenges, Shultz and others pressed to keep moving ahead with the four-part agenda and promote greater dialogue in U.S.-Soviet relations.

After the Soviet walkout of the INF negotiations in Geneva in late 1983, the administration focused throughout 1984 on developing a framework to restart arms control negotiations; the documents in this volume demonstrate the difficulties involved in opening new talks with the Soviet Union. Reagan's SDI program continued to cause problems. The Soviets believed SDI would "militarize space," and therefore the debates over how SDI would be dealt with during negotiations were a major point of contention during this period. When Shultz and Gromyko met in January 1985, they finally reached an agreement on a new round of umbrella negotiations. The Nuclear and Space Talks (NST), scheduled to begin in Geneva in March 1985, would have three tracks, START, INF, and Defense and Space. The documents in the volume trace how various positions from the Department of State, NSC, the Department of Defense, and the Central Intelligence Agency impacted the decision to move forward with the three arms control tracks. While the other parts of the four-part agenda remained in play during this period and were discussed in bilateral meetings, restarting arms control talks seemed to trump the other areas of concern. Little did the U.S. or Soviet negotiators know that on the eve of these new NST negotiations, Chernenko would die, and a younger, more ambitious Soviet leader would emerge and dramatically change the course of U.S.-Soviet relations.

*Acknowledgments*

The editor wishes to acknowledge the invaluable assistance of officials at the Ronald Reagan Presidential Library in Simi Valley, California, especially Lisa Jones and Cate Sewell. A special thanks to the Central Intelligence Agency staff for providing access and assistance with Reagan Library materials scanned for the Remote Archive Capture project, and to the History Staff of the CIA's Center for the Study of Intelligence for arranging full access to CIA records. The editor wishes to acknowledge the staff at Information Programs and Services at the Department of State for facilitating access to Department of State records and coordinating the review of this volume within the Department. Sandy Meagher was helpful in providing access to Department of Defense materials. The editor extends thanks to the family and executor of the Estate of former Secretary of Defense Caspar W. Weinberger for granting Department of State historians access to the personal papers of Secretary Weinberger deposited at the Library of Congress. Additional thanks are due to officials of the Library of Congress Manuscript Division for facilitating that access.

Elizabeth C. Charles collected, selected, and annotated the documentation for this volume under the supervision of David Geyer, Chief of the Europe Division, and Adam Howard, then General Editor of the *Foreign Relations* series. The volume was reviewed by David Geyer and then Historian Stephen Randolph. Kerry Hite and Chris Tudda coordinated the declassification review under the supervision of Carl Ashley, Chief of the Declassification Coordination Division. Kerry Hite also performed the copy and technical editing under the supervision of Mandy Chalou, Chief of the Editing and Publishing Division.

**Elizabeth C. Charles, Ph.D.**
*Historian*

# Contents

About the Series ................................................... III

Preface .............................................................. IX

Sources ............................................................. XV

Abbreviations and Terms ......................................... XIX

Persons ............................................................. XXV

Note on U.S. Covert Actions ..................................... XXXI

Soviet Union, January 1983–March 1985

  January 1983–April 1983

    "Dobrynin seemed like he wanted to run. But the
    Secretary is a jogger": Shultz and the Four-Part
    Agenda ....................................................... 1

  April 1983–August 1983

    Preparing the Next Steps in U.S.-Soviet Relations:
    Human Rights and Arms Control ......................... 120

  September 1983–October 1983

    "Controlled Fury": Shootdown of KAL 007 ............... 291

  October 1983–February 1984

    "The Winter of Soviet Discontent": INF Walkout, the
    War Scare, and the 'Ivan and Anya' Speech ............ 429

  February 1984–June 1984

    "Talking about each other rather than to each other":
    Reagan, Chernenko, and U.S.-Soviet Stalemate ........ 606

  June 1984–October 1984

    "Sitting on Mountains of Nuclear Weapons": The
    Reagan-Gromyko Meeting ................................. 845

  October 1984–January 1985

    "An iron-ass Secretary of State": Shultz and Gromyko
    in Geneva ................................................... 1079

January 1985–March 1985

"The principal menace to our security?": Reagan and
the Ambiguities of Soviet Leadership ..................... 1355

Appendix ......................................................... 1420

Page Left Intentionally Blank

# Appendix

## A.    Editorial Note

Stark deviations in assessments by the U.S. Intelligence Community of the November 1983 NATO exercise Able Archer and the Soviet "war scare" led to a much later 1990 investigation by the President's Foreign Intelligence Advisory Board during the George H.W. Bush administration, resulting in the report, "The Soviet 'War Scare.'" (George H.W. Bush Library, Bush Presidential Records, President's Foreign Intelligence Advisory Board, Subject Files; Reports to the President-War Scare Report 1990 [OA/IDCF01830–020]) The February 15, 1990, PFIAB report analyzed intelligence and reporting on the Soviet war scare, Able Archer, and other related activities. The PFIAB report stated: "During the past year, the President's Foreign Intelligence Advisory Board has carefully reviewed the events of that period to learn what we (the U.S. intelligence community) knew, when we knew it, and how we interpreted it. The Board has read hundreds of documents, conducted more than 75 interviews with American and British officials, and studied the series of National Intelligence Estimates (NIE's) and other intelligence assessments that have attempted over the last six years to interpret the war scare data. Additionally, we have offered our own interpretation of the war scare events." (PFIAB, pages vi–vii) Although outside the normal scope of this volume, the 1990 PFIAB report and other memoranda from 1988 and 1989 are addressed in this editorial note because the documents focus upon crucial events from 1983 to 1984.

Reactions from the Intelligence Community (IC) and policymakers to the events surrounding Able Archer and the Soviet "war scare" differed significantly and evolved over time. The contemporaneous reporting in 1983–1984 from the Central Intelligence Agency (CIA), National Intelligence Council (NIC), [*text not declassified*] drew varied conclusions about Soviet anxieties. While some reporting assessed that "Contrary to the impression conveyed by Soviet propaganda, Moscow does not appear to anticipate a near-term military confrontation with the United States" (see Document 157), another analysis presented evidence that [*text not declassified*].

Retrospective assessments of these events seem to conflate the NATO Able Archer exercise with the broader "war scare" talk emanating from Moscow related to INF deployments. The Soviet military unquestionably reacted to Able Archer differently than to previous NATO exercises. (See Document 134.) Whether the Soviet response was attributable to the circumstances of the time, to the "war scare"

(whether real or Soviet propaganda), or to a credible belief within the Soviet military leadership or the Politburo that the United States was planning to launch a nuclear first strike against the USSR, under the guise of a NATO exercise or otherwise, remains unclear on the basis of the available evidence.

After a year of research and a reassessment of the relevant intelligence and documentation, the PFIAB report stated: "We believe that the Soviets perceived that the correlation of forces had turned against the USSR, that the US was seeking military superiority, and that the chances of the US launching a nuclear first strike—perhaps under cover of a routine training exercise—were growing. We also believe that the US intelligence community did not at the time, and for several years afterwards, attach sufficient weight to the possibility that the war scare was real. As a result, the President was given assessments of Soviet attitudes and actions that understated the risks to the United States. Moreover, these assessments did not lead us to reevaluate our own military and intelligence actions that might be perceived by the Soviets as signaling war preparations.

"In two separate Special National Intelligence Estimates (SNIEs) in May and August 1984, the intelligence community said: 'We believe strongly that Soviet actions are not inspired by, and Soviet leaders do not perceive, a genuine danger of imminent conflict or confrontation with the United States.' Soviet statements to the contrary were judged to be 'propaganda.' [See Documents 221 and 264.]

"The Board believes that the evidence then did not, and certainly does not now, support such categoric conclusions. Even without the benefit of subsequent reporting and looking at the 1984 analysis of then available information, the tone of the intelligence judgments was not adequate to the needs of the President." (PFIAB, pages vi–vii)

During November 1983, Able Archer and the Soviet responses to this exercise received little immediate attention in the U.S. Intelligence Community. (See Document 135.) However, by spring 1984, some in the intelligence communities in the United States [*text not declassified*] believed the Reagan administration should have recognized Soviet sensitivities and anxieties about a potential U.S. first strike. [*text not declassified*].

According to the PFIAB report, [*text not declassified*] "KGB Deputy Resident Colonel Oleg Gordiyevskiy, [*text not declassified*] had witnessed what he saw as Soviet paranoia over a US nuclear first strike; [*text not declassified*] As one of the most senior KGB officers in London, [*text not declassified*]." (PFIAB, page 10)

In a covering memorandum [*less than 1 line not declassified*] to Director of Central Intelligence William Casey and others, Herbert Meyer, Vice Chairman of the National Intelligence Council, wrote: [*text not*

*declassified*]. The PFIAB report commented that the [*text not declassified*] report was "not well received in the US intelligence community." (PFIAB, pages 10–11)

Another contemporaneous analysis from the CIA, the May 1984 SNIE 11–10–84/JX concluded: "We believe strongly that Soviet actions are not inspired by, and Soviet leaders do not perceive, a genuine danger of imminent conflict or confrontation with the United States." (See Document 221.) The PFIAB report commented on this SNIE: "The estimate boldly declared that 'Recent Soviet war scare propaganda . . . is aimed primarily at discrediting US policies and mobilizing 'peace' pressures among various audiences abroad.' In a more piecemeal fashion, it was judged that 'Each Soviet action has its own military or political purpose sufficient to explain it.' The accelerated tempo of Soviet live exercise activity was explained simply as a reflection of 'long-term Soviet military objectives.'

"The Soviet reaction to Able Archer 83 was dismissed as a 'counter-exercise,' but analysts acknowledged that the 'elaborate Soviet reaction' was 'somewhat greater than usual.' [*less than 1 line not declassified*] prior to and during the exercise indicated that the Warsaw Pact Intelligence services, especially the KGB, were admonished 'to look for any indication that the United States was about to launch a first nuclear strike,' analysts concluded that 'by confining heightened readiness to selected air units, Moscow clearly revealed that it did not, in fact, think there was a possibility at this time of a NATO attack.' The assessment, however, was not specific about what type of defensive or precautionary Soviet activity might be expected—and detected—were they preparing for an offensive NATO move." (PFIAB, page 13)

The PFIAB report continued its critique of SNIE 11–10–84/JX: IC "analysts dismissed [*less than 1 line not declassified*] on the war scare, including the KGB's formal tasking to its Residencies. 'This war scare propaganda has reverberated in Soviet security bureaucracies and emanated through other channels such as human sources. [See for example, Document 144.] We do not believe it reflects authentic leadership fears of imminent conflict.'" The report contended: "Such judgments were made even though the analysis was tempered 'by some uncertainty as to current Soviet leadership perceptions of the United States, by continued uncertainty about the Politburo decisionmaking processes, and by our inability at this point to conduct a detailed examination of how the Soviets might have assessed recent US/NATO military exercises and reconnaissance operations'—which, of course, included the previous Able Archer exercise. In other words, US analysts were unsure of what the Kremlin leadership thought or how it made decisions, nor had they adequately assessed the Soviet reaction to Able Archer 83. This notwithstanding, the estimate concluded: 'We are confident that,

as of now, the Soviets see not an imminent military clash but a costly and—to some extent—more perilous strategic and political struggle over the rest of the decade.'" (PFIAB, page 14)

The Board had similar criticisms of the August 1984 SNIE 11–9–84, "Soviet Policy Toward the United States in 1984" (see Document 264), for its "categorical and unqualified" judgments "about the likelihood of the war scare," and the analysts' conclusions: "We strongly believe that the Soviet actions are not inspired by, and Soviet leaders do not perceive, a genuine danger of imminent conflict or confrontation with the United States. Also, we do not believe that the Soviet war talk and other actions 'mask' Soviet preparations for an imminent move toward confrontation on the part of the USSR." (PFIAB, page 19–20) The PFIAB report continued: "Analysts readily acknowledged that the previous six months had seen extraordinary, unprecedented Soviet activities. Large scale military exercise, 'anomalous behavior' during the troop rotation, withdrawn military support for the harvest (last seen prior to the 1968 Czech invasion), new, deployed weapons systems (termed 'in response to INF deployments'), and heightened internal vigilance and security activities were noted. These events, however, were judged to be 'in line with long-evolving plans and patterns, rather than with sharp acceleration of preparations for major war.'" (PFIAB, page 19)

The PFIAB report acknowledged that its assessment and criticism of the May and August 1984 SNIEs "derives from information not known at the time. Our purpose in presenting this report is not so much to criticize the conclusions of the 1984 SNIE's as to raise questions about the ways these estimates were made and subsequently reassessed." (PFIAB, page ix) The PFIAB report concluded: "Reasonable people can disagree about the conclusions of the 1984 SNIE's. The PFIAB does disagree with many of them. More worrisome to us, however, is the process by which the estimates were made and subsequently reassessed. Although both estimates were reportedly reviewed by outside readers—and both, but particularly the first, contained alternative scenarios—strongly worded interpretations were defended by explaining away facts inconsistent with them. Consequently, both estimates contained, in essence, single outcome forecasting based in large part on near-term anomalous behavior. Moreover, neither alerted the reader to the risks erroneously rejecting the correct scenario." (PFIAB, page 30) The PFIAB report criticized the performance of the IC in 1983–1984, showing that contemporary assessments of Soviet intentions after Able Archer did not go far enough in providing President Reagan with alternative scenarios, explaining that the anxiety from the Soviet leadership could have been real.

In criticizing contemporary estimates, the PFIAB report emphasized intelligence that had not been available to the IC during these

years, principally information provided by Gordiyevskiy after he defected in 1985. Robert McFarlane's thoughts on the influence of Gordiyevskiy's information on the President are recorded in a December 16, 1988, memorandum for the record:

## Memorandum for the Record

16 December 1988

SUBJECT

[*less than 1 line not declassified*] Robert F. McFarlane Regarding the Influence of Oleg Gordiyevskiy's Reporting on President Reagan

On 15 December [*less than 1 line not declassified*] Robert F. ("Bud") McFarlane, formerly National Security Advisor to the President, as to the veracity of claims [*less than 1 line not declassified*] that the reporting of KGB officer [*less than 1 line not declassified*] Oleg Gordiyevskiy about the Kremlin's fear of war greatly influenced President Reagan in the mid-1980s to seek better relations with the USSR. In response, Bud made several points:

He definitely remembered the reporting associated (later) with Gordiyevskiy that conveyed the Kremlin's fear of war. He also specifically recalled [*less than 1 line not declassified*] on Gordiyevskiy's assessments given to the President [*less than 1 line not declassified*].

He noted that he discussed this reporting with the President on several occasions. This was in the course of numerous discussions extending throughout 1983 and part of 1984 about the apparent anxieties being transmitted by Moscow through many channels, [*less than 1 line not declassified*].

The President, according to Bud, saw this reporting attributed to Gordiyevskiy in the larger context of a Soviet "war-scare" campaign arising from the NATO decision to deploy INF and from Reagan's hard line on defense, SDI, etc. In the President's view, either the Soviets were paranoid in strange ways we could not let bother us, or they were fabricating the appearance of fear to intimidate and sway us, which we should even more be prepared to ignore.

Often in these conversations, according to Bud, the President outlined his sustained intention to concentrate on building US strength and credibility in the first term and to move toward diplomatic reengagement in the second. The President's key speech of January 1984 [see Document 158] was a natural step in a long-planned shift of policy. Neither Gordiyevskiy's reporting nor the Soviet "war-scare" campaign in general were responsible for the evolution of the President's policy.

Bud said he'd been queried before on this matter by [*name not declassified*], a journalist, who might be (or have been) writing an article on it. Against the background of the above, Bud said he discounted Gordiyevskiy's impact on the President [*less than 1 line not declassified*].

[*1 paragraph (8½ lines) not declassified*]

[*name not declassified*]

(Central Intelligence Agency, National Intelligence Council, Job 90T00435R: Chronological Files (1988), Box 1, Folder 12: C/NIC Chrono for December 1988)

McFarlane's recollections in this memorandum for the record correlate with a January 1984 memorandum by Jack Matlock, Soviet specialist on the NSC Staff, which demonstrated an awareness of potential Soviet concerns, but concluded:

"—The Soviet leadership is not overly nervous about the immediate prospect of armed confrontation with the U.S.;

"—They are however very nervous about the prospects five to ten years down the road—not so much of a confrontation as such, as of a decisive shift in the balance of military power." (See Document 157.)

As mentioned in the 1988 memorandum for the record, McFarlane did recall "later" reporting to Reagan about Gordiyevskiy. The PFIAB report addressed Gordiyevskiy's situation in relation to the war scare and the 1984 SNIE assessments: "The Board found that after the 1984 assessments were issued, the intelligence community did not again address the war scare until after the defection to Great Britain of KGB Colonel Oleg Gordiyevskiy in July, 1985. Gordiyevskiy had achieved the rank of Acting Resident in the United Kingdom, but he fell under suspicion as a Western agent. Recalled to the Soviet Union, he was placed under house arrest and intensely interrogated. Able to flee his watchers, Gordiyevskiy was exfiltrated from Moscow by the British Secret Intelligence Service."

The report continued: "During lengthy debriefing sessions that followed, Gordiyevskiy supplied a fuller report on the Soviet war hysteria. This report, complete with documentation from KGB Headquarters and entitled 'KGB Response to Soviet Leadership Concern over US Nuclear Attack,' was first disseminated in a restricted manner within the US intelligence community in October 1985. Gordiyevskiy described the extraordinary KGB collection plan, initiated in 1981, to look for signs that the US would conduct a surprise nuclear attack on the Soviet Union. He identified and reviewed factors driving leadership fears. Based on the perception the US was achieving a strategic advantage, those in the Kremlin were said to believe that the US was likely to resort to nuclear weapons much earlier in a crisis than previously expected. They also were concerned the US might seek to exploit its first-strike capability outside the context of a crisis, probably during a

military exercise. He described the leadership's worries of a 'decapitating' strike from the Pershing II's, and its belief that the US could mobilize for a surprise attack in a mere seven to ten days. He explained how the London Residency responded to the requirements, and the effects that reporting had back at Moscow Center in reinforcing Soviet fears. He described conversations he had held with colleagues from Center and from the GRU. The next month, President Reagan held his first summit with Mikhail Gorbachev and relations began to thaw." (PFIAB, pages 22–23)

The PFIAB report also cited a January 1989 "End of Tour Report Addendum" by Lieutenant General Leonard H. Perroots, who had served as Assistant Chief of Staff for Intelligence, US Air Forces Europe, during the 1983 Able Archer exercise, to emphasize the potential consequences of the intelligence gap during the Able Archer exercise. Perroots addressed Able Archer as well as Gordiyevskiy's reporting in that memorandum:

1. (U) In 1983, I was assigned as the DCS for Intelligence, US Air Forces, Europe, Ramstein AB, Germany. The annual NATO Command and Control exercise ABLE ARCHER was scheduled to begin during the first week of November. The context of this nuclear command and control exercise was relatively benign; the scenario had been purposely chosen to be non-controversial, and the exercise itself was a routine annual event. This exercise closely followed the bombing of air defense sites in Lebanon and directly followed the invasion of Grenada. As I recall, however, there was no particular feeling of tension in the European Theater beyond that which is normal.

2. [*portion marking not declassified*] Only the fact that Soviet Intelligence collection assets (primarily low level signals intercept units) had failed to return to garrison after their normal concentrated coverage of NATO's AUTUMN FORGE exercise series could be reckoned strange at all. As the kickoff date of ABLE ARCHER neared it was clear that there was a great deal of Soviet interest in the forthcoming events. Again, this seemed nothing out of the ordinary. We knew that there was a history of intensive Soviet collection against practice Emergency Action Messages (EAM's) related to nuclear release.

3. [*portion marking not declassified*] ABLE ARCHER started in the morning of 3 November, and progressed immediately in the scenario to NATO STATE ORANGE. At 2100Z on 04 November NSA issued an electrical product report G/00/3083-83, entitled "SOVIET AIR FORCES, GSFG, PLACED ON HEIGHTENED READINESS, 2 NOVEMBER 1983." I saw this message on the morning of 5 November and discussed it with my air analysts. It stated that as of 1900Z on 02 November the fighter-bomber divisions of the air force of Group Soviet Forces, Germany had been placed in a status of heightened alert. All

divisional and regimental command posts and supporting command and control elements were to be manned around-the-clock by augmented teams.

4. [*portion marking not declassified*] In addition to the directed command and control changes the fighter-bomber divisions were also ordered to load out one squadron of aircraft in each regiment (if this order applied equally across GSFG the result would have been at least 108 fighter-bombers on alert). These aircraft were to be armed and placed at readiness 3 (30 minute alert) to "destroy first-line enemy targets." The alert aircraft were to be equipped with a self-protection jamming pod. We knew from subsequent NSA reporting that a squadron at Neuruppin, East Germany sought and was apparently granted permission to configure its aircraft without the ECM pod because of an unexpected weight and balance problem. My air analysts opined that this message meant that at least this particular squadron was loading a munitions configuration that they had never actually loaded before, i.e., a warload.

5. [*portion marking not declassified*] At this point, I spoke to CinC-USAFE, General Billy Minter. I told him we had some unusual activity in East Germany that was probably a reaction to the ongoing ABLE ARCHER. He asked if I thought we should increase the real force generation. I said that we would carefully watch the situation, but there was insufficient evidence to justify increasing our real alert posture. At this point in the exercise our forces were in a simulated posture of NATO State ORANGE and local SALTY NATION tests involving simulated generation of combat aircraft were underway at various locations including Ramstein AB. If I had known then what I later found out I am uncertain what advice I would have given.

6. [*portion marking not declassified*] An NSA message dated 022229Z DEC 83 provided the rest of the picture as far as we knew it—at least until the reports began to surface from the British penetration of the KGB, Oleg Gordievskiy. This GAMMA message was entitled "SOVIET 4th AIR ARMY AT HEIGHTENED READINESS IN REACTION TO NATO EXERCISE ABLE ARCHER, 2–11 NOVEMBER 1983." This report stated that the alert had been ordered by the Chief of the Soviet Air Forces, Marshal Kutakhov, and that all units of the Soviet 4th Air Army were involved in the alert "which included preparations for immediate use of nuclear weapons." This report described activity that was contemporaneous with that reflected in East Germany, but because of the specific source of this material it was not available in near realtime. The two pieces taken together present a much more ominous picture.

7. [*portion marking not declassified*] Equally ominous in its own way was the fact that this alert was never reflected at all by the I&W system.

At the time of this occurrence there was no distribution of electrically reported GAMMA material to the Tactical Fusion Center at Boerfink. I remedied that shortfall in the aftermath of this activity. Secondly, a real standdown of aircraft was secretly ordered in at least the Soviet Air Forces units facing the Central Region, and that standdown was not detected. The Soviet alert in response to ABLE ARCHER began after nightfall on Wednesday evening, there was no flying on the following two days which led to the weekend, and then the following Monday was 7 November, the revolution holiday. The absence of flying could always be explained, although a warning condition was raised finally on about the ninth of November when overhead photography showed fully armed FLOGGER aircraft on air defense alert at a base in East Germany. When this single indicator was raised, the standdown had been underway for a week.

8. [*portion marking not declassified*] For the next six months I was on a soapbox about ABLE ARCHER whenever I could discuss it at the appropriate classification level. I spoke to the Senior Military Intelligence Officers' Conference (SMIOC), and I buttonholed a lot of people. I suggested that perhaps we should move our annual exercise away from the November 7 holiday, because it is clear to me that the conjunction of the two events causes a warning problem that can never be solved. Our problem here was that we had a couple of very highly classified bits of intelligence evidence about a potentially disastrous situation that never actually came to fruition. For decision-makers it was always difficult to believe that there could have been any serious reaction by the Soviets to such a "benign" exercise as ABLE ARCHER. From the Soviet perspective, however, it might have appeared very different. It was difficult for all of us to grasp that, but Oleg Gordievskiy's reporting began to provide a somewhat more frightening perspective when it became available in the Fall of 1985.

9. (S) By the time Gordievskiy's reporting began to surface for analytical review I was the Director of DIA. Gordievskiy's initial reporting about a "war scare" in 1983 immediately caught my attention. It should be pointed out at the outset that Gordievskiy knew nothing of a military alert during ABLE ARCHER. He did, however, tell us something of a chilling story about Moscow Center's Intelligence tasking during 1983. He related that there was a project called either "RYaN" or "VRYaN," the latter probably being the full form of a Russian acronym meaning "sudden rocket nuclear attack." There was a cadre of specialists in Moscow Center charged with, among other things, finding the evidence of planning for a western attack on the Soviet Union. Beginning in 1982 and continuing into 1983 Gordievskiy says that this group became ever more insistent that an attack was being planned by the West. By March 1983 the KGB officers in Moscow

had decided that ABLE ARCHER 83 would provide an excellent cover for the planned attack, and KGB and GRU residencies around the world were being directed to find the evidence. Gordievskiy, living in London at the time, states that he never believed there was really a threat, and that the London residency of the KGB simply ignored the collection requirements until it began to become clear that Moscow was serious. During the summer of 1983 the London residency sent some reports that, in retrospect, Gordievskiy believed might have hyped the war hysteria. He never really believed in the threat, however, and reported during his debriefing in 1985 that he thought the VRYaN hysteria might have been some kind of internal political ploy. I must reiterate again that Gordievskiy did not know about the secret military alert of November 1983.

10. [*portion marking not declassified*] The US intelligence community has never really closed with this analytical problem. A SNIE addressed this subject, [*1½ lines not declassified*]. The position has been taken again and again that had there been a real alert we would have detected more of it, but this may be whistling through the graveyard. It is not certain that we looked hard enough or broadly enough for information. For Western collectors the context was peacetime without even the most basic ripples of crisis. For the Soviets, however, the view may have looked quite different. It is uncertain how close to war we came or even if that was a possibility at all, but we know from Gordievskiy that the analysts in Moscow had predicted that the West would launch the attack from a posture of NATO State ORANGE. What might have happened that day in November 1983 if we had begun a precautionary generation of forces rather than waiting for further information?

(Central Intelligence Agency, National Intelligence Council, Job 91B00551: Speeches, Lectures, Briefing Files (1988–1989), Box 1, Folder 2: C/NIC (Ermarth) Chrons March 1989)

The PFIAB report commented that "as his parting shot before retirement," Perroots, who served as DIA Director from 1985 to 1989, sent a January 1989 "letter outlining his disquiet over the inadequate treatment of the Soviet war scare to, among others, the DCI and this Board." The report continued: "Following the detection of the Soviet Air Forces' increased alert status, it was his [Perroots's] recommendation, made in ignorance, not to raise US readiness in response—a fortuitous, if ill-informed, decision given the changed political environment at the time." (PFIAB, pages 27–28) In further accord with Perroots's report, the PFIAB report concluded: "As it happened, the military officers in charge of the Able Archer exercise minimized the risk by doing nothing in the face of evidence that parts of the Soviet armed forces were moving to an unusual alert level. But these officials acted correctly out of instinct, not informed guidance, for in the years leading up to Able

Archer they had received no guidance as to the possible significance of apparent changes in Soviet military and political thinking." (PFIAB, page x)

[*name not declassified*] the National Warning Staff and [*name not declassified*] of the Office of Soviet Analysis prepared an undated memorandum reacting to Perroots's comments, which was distributed by Ermarth to the DCI and DDCI for consideration:

SUBJECT

Comments on Memorandum of Lieutenant General Perroots

*Summary*

1. General Perroots's memorandum describes in detail a worrisome episode in which Soviet Air Forces in Central Europe assumed an abnormally high alert posture in early November 1983 in response to a routine NATO command post and communications exercise. Two Special National Intelligence Estimates (SNIEs)—written in May and August 1984 respectively—treated the events described in the General's memorandum in the larger context of US-Soviet relations. Those Estimates judged that the Soviets displayed a heightened sense of concern in many areas of national life primarily because of the more aggressive policies of the US Administration in the early 1980s, the US strategic modernization program that included the peacekeeper ICBM and the D–5 SLBM, the actual implementation of NATO's 1979 decision for Intermediate Range Nuclear Force (INF) modernization by deployment of the first Pershing–II missile systems to Europe, and because of the leadership instability in the USSR from the successive deaths of three general secretaries between 1981 and 1985. A National Intelligence Estimate in 1988 assessed the significance of the events in 1983 with the benefit of a longer time perspective and reached the same broad conclusions. General Perroots's memorandum and its enclosure neither raises no new issues nor contains new data that change the strategic judgements already written. [*portion marking not declassified*]

2. At the tactical and theater level, however, General Perroots's memorandum surfaces a long-standing warning problem, i.e., the need for the Intelligence Community in Washington to provide more timely, discriminating, and accurate warning in support of the theater commander. Perroots, who at the time was Assistant Chief of Staff for Intelligence, US Air Forces Europe (USAFE), describes three serious problems for which there are only partial answers. First, he believes that, despite the enormous amount of resources and energy spent in guarding against a strategic surprise attack, USAFE was not well informed in that the US warning systems did not detect in a timely fashion the extent of Soviet precautionary readiness measures undertaken in November 1983 in response to NATO exercise Able Archer.

Secondly, he believes that Washington-based agencies had relevant information which was not available to the European Command when he recommended against a precautionary US alert by US Air Forces Europe in response to the detection of the increased alert status of the Soviet Air Forces. Finally, [*1½ lines not declassified*], General Perroots is concerned that in similar circumstances—even if there is better intelligence—another officer in his position might recommend a precautionary US Air Force alert in Europe that could have serious escalatory consequences, unless there are timely, national level assessments available. [*portion marking not declassified*]

3. The dilemma that General Perroots has described is characteristic of the warning problems faced by senior US military intelligence chiefs in many past crises, in which decisions about US force posture were dependent upon threat assessments prepared rapidly and based on fragmentary and incomplete intelligence. General Perroots's memorandum reinforces two long-standing lessons of warning: warning systems are no substitute for seasoned, professional judgment and assessments; and they require constant attention and improvement. In terms of process, however, his memorandum reinforces the requests of successive SACEURs and other US theater commanders for better ways to provide more timely national-level warning assessments to the theater intelligence staffs.

*The Setting of Exercise Able Archer, 1983*

4. The larger context of the period, often referred to as the "war scare," reflected increasing Soviet concern over the drift in superpower relations, which some in the Soviet leadership felt indicated an increased threat of war and increased likelihood of the use of nuclear weapons. These concerns were shaped in part by a Soviet perception that the correlation of forces was shifting against the Soviet Union and that the United States was taking steps to achieve military superiority. These fears were exacerbated by planned improvements in US strategic forces, as well as by progress made by NATO to implement its 1979 decision began with NATO's deliberations in the late 1970s to modernize its theater nuclear forces by deploying Pershing–II missiles and Ground Launched Cruise Missiles (GLCMs) to Europe. By 1981, after the new US Administration was inaugurated, the Soviet concern intensified almost concurrently with General Secretary Brezhnev's decline in health [*portion marking not declassified*]

5. [*1½ lines not declassified*] the increased Soviet concern stemmed from a fear by some Soviet leaders that the West might seek to exploit its new capability in Europe for a preemptive nuclear surprise attack against the USSR, for which the Soviets had no defense. From a national security standpoint, this Western capability led to questions about the

long-standing Soviet view that crises and other adverse developments in international affairs would precede the outbreak of war and be the basis for long-term early warning. The Soviets had concern that the West might decide to attack the USSR without warning during a time of vulnerability—such as when military transport was used to support the harvest—thus compelling the Soviets to consider a preemptive strike at the first sign of US preparations for a nuclear strike. [*portion marking not declassified*]

6. From Brezhnev's death in 1982 through late 1984, the Soviets ordered a number of unusual measures not previously detected except during periods of crisis with the West. These included: disruption of the normal troop rotation cycle for Soviet forces in central Europe in 1984; updating civil defense procedures in the USSR from 1982 through 1984; in the spring of 1984 the first, and apparently only, time that Soviet military trucks were not sent to support the harvest since the end of World War II; and increased alert reactions even to routine NATO training from 1982 to 1984. The cumulative effect of these and other measures was to reduce the Soviet and Warsaw Pact vulnerability to a surprise attack. The abnormal Soviet reaction to NATO Exercise Able Archer in November 1983 occurred within this setting. [*portion marking not declassified*]

7. Concurrent with the military dimension, [*less than 1 line not declassified*] other precautionary measures taken by the Soviets probably were a reflection of the political maneuvering in the Kremlin in 1982 and 1983 associated with Andropov's rise to power. In exchange for military support for his bid to become General Secretary, Andropov, then KGB Chairman, may have promised greater allocations of resources for military industrial expansion, improved civil defense readiness, and military modernization. All of these were espoused by the Chief of the General Staff at the time, Marshal Ogarkov. Successful manipulation of threat perceptions by the KGB at Andropov's direction would have helped cultivate the strong military backing Andropov enjoyed when he came to power. In this environment, the heightened Soviet military reactions to NATO exercises would have been expected. [*portion marking not declassified*]

8. Finally, [*less than 1 line not declassified*] the Soviets wanted the new US Administration to tone down its anti-Soviet rhetoric, moderate its hostile attitudes, and begin serious business on trade and arms control. Some analysts believe that the Soviet activities, [*1 line not declassified*], were intended to be detected and were contrived to nudge Washington toward a more conciliatory and cooperative attitude in dealings with Moscow. [*less than 1 line not declassified*]

*Intelligence Community Performance*

9. Since 1983, the Intelligence Community, CIA's Office of Soviet Analysis, and the Defense Intelligence Agency have treated the events

surrounding the Able Archer episode in a number of in-house publications and national estimates. When General Perroots was Director, DIA, analysts concurred in the Community assessments in 1988 that the "war scare" period of heightened Soviet concern was triggered by the change of the US Administration and its policy decisions toward the Soviet threat; that at least some Soviet leaders concluded that a surprise nuclear attack by NATO was possible outside the context of a crisis; and that this led to a number of Soviet responses consistent with such a conclusion, including high priority intelligence collection taskings. DIA believes, however, that the Soviet measures were primarily a function of the internal leadership instability from which Andropov emerged as General Secretary. [*portion marking not declassified*]

*General Perroots's Problem*

10. The events surrounding NATO Exercise Able Archer, however, all occurred some months before the first national-level assessments were written, and General Perroots was confronted with a serious choice of what recommendation to make to the Commander, US Air Forces Europe. The Department of Defense warning indicators system reflected that, [*less than 1 line not declassified*] Soviet air units in Poland and East Germany were observed at a high state of alert, although no other Soviet strategic forces adopted such a posture. [*2½ lines not declassified*] Consequently, the Commander, US Air Forces Europe, was concerned whether he should exercise his discretionary authority to increase the alert posture of his force. General Perroots recommended that no precautionary US alert be instituted, despite the evidence of his own warning system. Several days later, the Soviet air forces returned to normal alert status. [*portion marking not declassified*]

11. [*1 paragraph (10 lines) not declassified*]

12. General Perroots's concerns about this episode are legitimate to the extent that they deal with Washington's support to the US military commands. [*4½ lines not declassified*] Third, national-level assessments of Soviet intentions were not available when most needed. The General's memorandum indicates the Defense Department has taken steps to correct the problems in the processing and dissemination of intelligence. The third problem, of timely national-level support, is continuous. As Director of DIA, General Perroots himself initiated organizational and procedural changes to improve DIA's support to the commands. [*portion marking not declassified*]

13. Underlying all of the above, however, is the paradox that General Perroots believes he made a correct judgment, but for the wrong reasons. This is not a new problem nor is there a solution to it. General Perroots has accurately identified inherent limits of the warning systems as they now exist. His candor is a safeguard against complacency

and denial that problems exist. Additionally, he raises again the need for better understanding in Washington of the problems facing intelligence in the field. [*portion marking not declassified*]

[*name not declassified*]          [*name not declassified*]
Chief, TFD/RIG/SOVA    Director, National Warning Staff

(Central Intelligence Agency, National Intelligence Council, Job 91B00551: Speeches, Lectures, Briefing Files (1988–1989), Box 1, Folder 2: C/NIC (Ermarth) Chrons March 1989)

The 1990 PFIAB report repeatedly stressed: "During the November 1983 NATO 'Able Archer' nuclear release exercise, the Soviets implemented military and intelligence activities that previously were seen only during actual crises. These included: placing Soviet air forces in Germany and Poland on heightened alert, [*4 lines not declassified*]."

The PFIAB report argued: "The meaning of these events obviously was of crucial importance to American and NATO policymakers. If they were simply part of a Soviet propaganda campaign designed to intimidate the US, deter it from deploying improved weapons, and arouse US domestic opposition to foreign policy initiatives, then they would not be of crucial significance. If they reflected an internal power struggle—for example, a contest between conservatives and pragmatists, or an effort to avoid blame for Soviet economic failures by pointing to (exaggerated) military threats—then they could not be ignored, but they would not imply a fundamental change in Soviet strategy. But if these events were expressions of a genuine belief on the part of Soviet leaders that the US was planning a nuclear first strike, causing the Soviet military to prepare for such an eventuality—by, for example, readying itself for a preemptive strike of its own—then the 'war scare' was a cause for real concern." (PFIAB, page vi)

The PFIAB report concluded that the IC's failure to adequately report on Able Archer and the 1983–1984 Soviet war scare had important implications for the future: "In cases of great importance to the survival of our nation, and especially where there is important contradictory evidence, the Board believes that intelligence estimates must be cast in terms of alternative scenarios that are subjected to comparative risk assessments. This is the critical defect in the war scare episode." (PFIAB, page ix)

# June 30, 2021 Agreement Between the National Security Archive and the Defense Intelligence Agency

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NATIONAL SECURITY ARCHIVE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 19-0529 (CJN) |
| | ) |
| DEFENSE INTELLIGENCE AGENCY, | ) |
| | ) |
| Defendant. | ) |

## JOINT STATUS REPORT

Pursuant to the Court's instruction at the June 8, 2021, hearing held in this matter, Plaintiff National Security Archive ("Plaintiff") and Defendant Defense Intelligence Agency ("Defendant" or "DIA"), a component-agency of U.S. Department of Defense ("DOD"), through undersigned counsel, respectfully submit this Joint Status Report.

1.      The Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, request that is the subject of this case sought disclosure of files from three specifically-identified boxes of records that were in the possession of the National Archives and Records Administration ("NARA") and located in the Washington Records Center in Suitland, Maryland.  The FOIA request and Plaintiff's Complaint identified the requested files by accession number, volume, location, file name and date, and box number.  Docket Entry Nos. 1, 1-3, Feb. 28, 2019 (Complaint and Exhibit A to Plaintiff's Complaint, copy of Plaintiff's original FOIA request).  Plaintiff's original FOIA request sought copies of all documents stored in the specified boxes at the Washington Records Center.  *Id.*

2.      On June 8, 2021, the Court held a hearing in this matter to address disputes between the parties regarding two documents that were not contained in the three boxes but were listed

on the indices (that DIA understands NARA created) of the boxes' contents that DIA provided to Plaintiff in the beginning of the case: (i) 1/9/89 "End of Tour Report (Addendum) General Perroots"; and (ii) 3/17/89 "End of Tour Report (LtGen Perroots)". At the close of the hearing, the Court instructed the parties to confer to determine whether they could reach an agreement regarding how to move forward to resolve the disputes.

3. The parties have conferred and have reached an agreement consisting of the following terms:

    a. Plaintiff will submit a new FOIA request to Defendant specifically requesting the two documents at issue;

    b. Defendant will promptly begin processing the request after it is received; and

    c. Defendant will provide Plaintiff with an update regarding the processing of the new FOIA request three weeks after the request is received.

4. Defendant clarifies that although it has agreed to accept a new FOIA request and promptly process the request, the parties' agreement does not include litigating any issues that arise regarding the new FOIA request as part of the instant litigation. It is Defendant's position that any issues that arise regarding the new FOIA request should first be channeled through the administrative process like any other FOIA request, because the request that is the subject of this suit specifically identified three boxes, which DIA searched for and located, whereas the new FOIA request is asking DIA to search for specific documents within the Agency, which is a substantively different request and not a subset of the original request. Further, Defendant believes its agreement to promptly process a new FOIA request for the two documents without adding this new FOIA request to this litigation is more than reasonable in light of the fact that Plaintiff has known since December 2019 that Document No. 2 (3/17/89 "End of Tour Report (LtGen Perroots)") was not in the boxes, *see* ECF No. 19 at ¶ 9 (Joint Status Report of 12/20/2019), but Plaintiff never filed a new FOIA

request seeking this document and Plaintiff waited until May 2021 to assert that a search within the Agency should be conducted for this document.

5. Plaintiff's position is that, because the scope of its original FOIA request sought copies of the two missing documents *wherever* they may exist within DIA's possession, not just within the two boxes, any issues arising from the new FOIA request should be litigated in this case. NARA and DOD FOIA regulations instruct FOIA requestors to include as much information and specificity as possible about the records being sought, including possible document locations (*i.e.*, file designation and reference number). 36 C.F.R. § 1250.20(a); 32 C.F.R. § 286.5(a). *See also* NARA, FOIA Reference Guide (2018, https://www.archives.gov/foia/foia-guide. This is what Plaintiff did. Further, Plaintiff's Complaint made plain that the two documents at issue were those Plaintiff was most interested in, as have many subsequent filings in this case. Docket Entry No. 1, Feb. 28, 2019. *See also, e.g.*, Docket Entry Nos. 35, 37, 39. Plaintiff reserves the right to raise this issue at a later stage in the case.

6. Plaintiff further states that its timing of raising these issues is entirely reasonable in light of the fact that it did not learn that the indices were inaccurate until *May 2021*, *two* years into the case. December 10, 2019 was DIA's first substantive response to Plaintiff's FOIA request — DIA had not previously processed *any* documents in this matter. In its first response, DIA processed a total of three documents, including Document No. 2. Docket Entry No. 35, p. 7 (Appendix B to Plaintiff's April 7, 2021 Status Report, outlining history of DIA's processing of documents between December 10, 2019 and March 31, 2019). Between February 11, 2019 and March 31, 2019, DIA subsequently processed 24 additional documents. *Id.* at p. 2, 7. Plaintiff did not learn that *any* other documents were

not found in their files or in the boxes until May 5, 2021, when DIA confirmed that the document it had produced on April 31, 2021 purporting to be Document No. 1, was not in fact the "End of Tour Report (Addendum)" listed in the indices as being in the boxes. Docket Entry No. 37 (Plaintiff's May 11, 2021 Status Report). The "End of Tour Report (Addendum)" (Document No. 1), is a separate document from the "End of Tour Report" (Document No. 2). Accordingly, Plaintiff did not know that there was a broader issue regarding the accuracy of the indices and the presence of the records until the spring of 2021, at which point Plaintiff promptly informed DIA and the Court of the missing documents. *Id.;* Docket Entry No. 37-6 (May 2021 Email Thread between H. Jacobs and A. Seabrook).

Dated: June 29, 2021                                  Respectfully submitted,

*For Plaintiff:*                                            *For Defendant:*

John S. Guttmann                                      CHANNING D. PHILLIPS, Bar No. 415793
D.C. Bar No.: 251934                                 Acting United States Attorney
Beveridge & Diamond, P.C.

                                                             BRIAN P. HUDAK
                                                             Acting Chief, Civil Division
*//s//  Hilary T. Jacobs*
Hilary T. Jacobs
D.C. Bar No. 1021353;                                 By: */s/  April Denise Seabrook*
Beveridge & Diamond, P.C.                       APRIL DENISE SEABROOK
1350 I Street, N.W., Suite 700                    D.C. Bar No. 993730
Washington, D.C. 20005-3311                   Assistant United States Attorney
Telephone: (202) 789-6020                        555 4th Street, N.W.
Facsimile: (202) 789-6190                         Washington, D.C. 20530
Email: jguttmann@bdlaw.com                   (202) 252-2525
                                                             April.Seabrook@usdoj.gov